**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MICHAEL WALKER, derivatively on behalf of DOMINO'S PIZZA, INC.,

Plaintiffs,

vs.

RUSSELL WEINER, SANDEEP REDDY, JOSEPH H. JORDAN, ARTHUR P. D'ELIA, ANDREW BALLARD, ANDREW BALSON, CORIE BARRY, DAVID BRANDON, DIANA CANTOR, RICHARD FEDERICO, JAMES GOLDMAN, and PATRICIA LOPEZ,

Defendants,

and

DOMINO'S PIZZA, INC.,

Nominal Defendant.

Case No.: 2:26-cv-10501

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## INTRODUCTION

Plaintiff Michael Walker ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Domino's Pizza, Inc. ("Domino's" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Russell Weiner ("Weiner"), Sandeep Reddy ("Reddy"), Joseph H. Jordan ("Jordan"), Arthur P. D'Elia ("D'Elia"), Andrew Ballard ("Ballard"), Andrew Balson ("Balson"), Corie Barry ("Barry"), David Brandon ("Brandon"), Diana Cantor ("Cantor"), Richard Federico ("Federico"), James Goldman ("Goldman"), and Paticia Lopez ("Lopez") (collectively, the "Individual Defendants," and together with Domino's, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Domino's, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Weiner, Reddy, Jordan, and D'Elia for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of internal corporate

documents produced by Defendants to Plaintiff's counsel,[1] a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Domino's, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from December 7, 2023 through July 17, 2024, inclusive (the "Relevant Period").

2. Domino's is a Delaware-incorporated pizza company. Domino's was founded in 1960 and now operates as the largest pizza company in the world. Although Domino's main product is pizza, it also offers an array of beverages and other food options.

3. The Company's stores apply two primary business models. Domino's "delivery" model allows customers to place their order over the phone or online and

[1] References to "DPZ_220_0000_____" are to the Books and Records.

receive their meal via direct delivery. Domino's "carryout" model allows customers to place their order over the phone, online, in-store, or through a store's drive-thru window, and then pick up their meal at the Domino's location. The Company's operations are comprised of the following three segments: (1) U.S. stores; (2) supply chain; and (3) international franchise.

4. Domino's states that it has more than 21,300 stores in over 90 different markets, and the Company reported over $19.1 billion in global retail sales in 2024. For the purposes of international markets, Domino's offers geographic rights to operate its stores in designated geographic locations to "master franchisees."

5. The Company's largest master franchisee is Domino's Pizza Enterprises Limited ("DPE"), which operates 3,840 stores across twelve international markets. As such, DPE accounts for roughly 28% of the Company's international store count and 19% of its global store count at the close of 2023.

6. The Company has developed innovative ordering platforms for its food, and more than 85% of the Company's retail sales in 2024 came from these digital channels.

7. Prior to the start of the Relevant Period, DPE was experiencing substantial difficulties notably having to close numerous stores in 2023 as part of its corporate restructuring. Nevertheless, Domino's represented to investors that DPE's

financial issues would not materially affect the Company's net store growth guidance.

8. On December 7, 2023, the Company hosted an Investor Day (the "2023 Investor Day"). During this 2023 Investor Day presentation, the Individual Defendants provided long-term guidance for the Company's growth into 2028. The presentation stated that there would be "1,100+" annual global net store growth for the years 2024 to 2028.

9. The long-term guidance announced in the 2023 Investor Day presentation was further reiterated throughout the Relevant Period.

10. The truth emerged on July 18, 2024 when the Company issued a press release announcing that it "expects it will fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures" being faced by DPE. The press release further stated that "[t]he Company is temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net store growth are known."

11. On an earnings call held the same day, Defendant Reddy stated that the long-term guidance issued during the 2023 Investor Day did not accurately reflect the challenges facing the DPE regarding the closures and openings of new stores.

12. On this news, Domino's stock price fell $64.23 per share, or 13.6%, from a closing price of $473.27 per share on July 17, 2024 to close at $409.04 per share on July 18, 2024.

13. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (i) DPE was experiencing significant challenges with respect to both new store openings and closures of existing stores; (ii) as a result, the Company was unlikely to meet its long-term guidance announced in the 2023 Investor Day presentation for global annual net store growth; and (iii) the Company's business and/or financial prospects were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

14. Moreover, three of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading

statements discussed herein, reaping personal profits of approximately $15.2 million.

15. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Domino's to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentation. Indeed, between January 2024 and July 2024, approximately 65,386 shares of Domino's stock were repurchased at artificially inflated prices, costing the Company approximately $29.2 million. As the Company's stock was actually worth only $409.04 per share, the price at which it was trading when the markets closed on July 18 2024, the Company overpaid for repurchases of its own stock by approximately $2.5 million in total.

16. In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Executive Vice President ("EVP") - Chief Financial Officer ("CFO"), its President of U.S. and Global Services, and its former EVP of International, to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Michigan (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual

Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Weiner's and Defendant Reddy's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17

C.F.R. §240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

23. Plaintiff is a current shareholder of Domino's. Plaintiff has continuously held Domino's common stock since first purchasing shares on October 16, 2009.

### Nominal Defendant Domino's

24. Domino's is a Delaware corporation with principal executive offices at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan 48105. Domino's common stock trades on The Nasdaq Global Market LLC ("NASDAQ") under the ticker symbol "DPZ."

**Defendant Weiner**

25. Defendant Weiner has served as the Company's CEO since May 2022 and as a Company director since April 2022. He previously various roles at the Company since 2008, most recently as Chief Operating Officer and President – Domino's U.S. from July 2020 to April 2022.

26. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Weiner made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| February 20, 2024 | 15,960 | $418.94 | $6,686,218 |
| April 29, 2024 | 11,780 | $530.16 | $6,245,261 |

Thus, in total, before the fraud was exposed, Defendant Weiner sold 27,740 shares of Company stock on inside information, for which he received approximately $12.9 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were

exposed, demonstrate his motive in facilitating and participating in the scheme.

27. The proxy statement the Company filed with the SEC on March 14, 2025 (the "2025 Proxy Statement") stated the following about Defendant Weiner:

> Russell J. Weiner has served as Domino's Chief Executive Officer since May 2022. Prior to becoming CEO, Mr. Weiner served as Chief Operating Officer and President – Domino's U.S. from July 2020 to April 2022, Chief Operating Officer and President of the Americas from July 2018 to July 2020, President, Domino's USA from October 2014 to July 2018, and joined Domino's as Executive Vice President and Chief Marketing Officer in September 2008. Prior to joining Domino's, Mr. Weiner held various marketing positions at PepsiCo, Inc. from 1998 to 2008, most recently serving as Vice President of Marketing, Colas for Pepsi-Cola North America.
>
> Mr. Weiner has served on Domino's Board of Directors since April 2022, when he was elected in conjunction with his appointment as Chief Executive Officer effective May 2022. Mr. Weiner also serves on the Board of Directors of The Clorox Company.

**<u>Defendant Reddy</u>**

28. Defendant Reddy has served as the Company's EVP - CFO since April 2022.

29. The "Leadership" page of the Company's website[2] states the following about Defendant Reddy:

> Sandeep Reddy has served as Domino's executive vice president – chief financial officer since joining the company in April 2022. He is responsible for leading the company's environmental, social and governance efforts, as well as its financial strategy and operations, including budgeting, planning, treasury, accounting, tax, financial

[2] https://biz.dominos.com/about-us/leadership/

reporting, risk management, and investor relations.

Before joining Domino's, Reddy served as executive vice president and CFO of Six Flags Entertainment Corp. since July 2020. He led the company's emergence from the pandemic with strong financial results in 2021 and served as a strategic thought partner to the CEO and the leadership team in strategy development. Reddy worked as the CFO of GUESS? Inc. from July 2013 to December 2019. Prior to that role, since 2010, he served as vice president and European CFO of GUESS? Inc., where he was responsible for all aspects of the company's European finance functions, including financial planning, treasury, accounting, and tax. From 1997 to 2010, Reddy held a variety of positions with increasing responsibility for Mattel Inc., ultimately serving as vice president of finance and supply chain for France, Spain, Portugal, and Italy.

Reddy holds a Bachelor of Arts in economics from Delhi University and a Master of Business Administration from Cornell University. He has served on the board of directors of Masco Corp. since June 2023.

**Defendant Jordan**

30. Defendant Jordan has served as the Company's President of U.S. and Global Services since May 2022. Previously, Defendant Jordan served as the Company's Executive Vice President of International from April 2018 to April 2022.

31. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Jordan made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| January 24, 2024 | 157 | $421.77 | $66,218 |
| February 28, 2024 | 2,630 | $446.06 | $1,173,138 |

| | | | |
|---|---|---|---|
| March 12, 2024 | 1,325 | $443.90 | $588,168 |
| April 1, 2024 | 237 | $493.92 | $117,059 |
| July 15, 2024 | 62 | $483.03 | $29,948 |

Thus, in total, before the fraud was exposed, Defendant Jordan sold 4,411 shares of Company stock on inside information, for which he received approximately $2 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32. The Annual Report the Company filed on Form 10-K with the SEC on February 24, 2025 stated the following about Defendant Jordan:

> ***Joseph H. Jordan*** has served as Domino's President, U.S. and Global Services since May 2022. Mr. Jordan previously served as Executive Vice President of International from April 2018 to April 2022, Senior Vice President and Chief Marketing Officer from May 2015 to April 2018, and joined Domino's as Vice President of Innovation in September 2011. Prior to joining Domino's, Mr. Jordan served most recently as Senior Director of Marketing at Pepsi-Cola North America where he worked for six years, held marketing roles at Philips Electronics and Unilever and was a consultant for Accenture. Mr. Jordan also serves on the Board of Directors of The Boston Beer Company, Inc. and DPC Dash Ltd.

**<u>Defendant D'Elia</u>**

33. Defendant D'Elia served as the Company's Executive Vice President, International from May 2022 to October 16, 2024.

34. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant D'Elia made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| January 24, 2024 | 101 | $421.77 | $42,599 |
| March 12, 2024 | 440 | $443.90 | $195,316 |
| April 1, 2024 | 89 | $493.92 | $43,959 |
| July 15, 2024 | 59 | $483.03 | $28,499 |

Thus, in total, before the fraud was exposed, Defendant D'Elia sold 689 shares of Company stock on inside information, for which he received approximately $310,373 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35. The Annual Report on Form 10-K the Company filed with the SEC on February 26, 2024 (the "2023 Form 10-K") stated the following about Defendant D'Elia:

> ***Arthur P. D'Elia*** has served as Domino's Executive Vice President, International since May 2022. Mr. D'Elia served as Executive Vice President, Chief Marketing Officer from July 2020 to April 2022 and as Senior Vice President, Chief Marketing Officer from February 2020 to July 2020. Mr. D'Elia joined Domino's in January 2018 as Senior Vice President, Chief Brand and Innovation Officer. Prior to Domino's, Mr. D'Elia served as Chief Marketing Officer for Danone Dairy's UBN business unit from July 2017 to January 2018 after joining Danone U.S. in April 2010, and worked at PepsiCo in corporate strategy,

> development and marketing for the North American beverage business from June 2003 to March 2010. Mr. D'Elia also serves on the Board of Directors of DPC Dash Ltd.

**<u>Defendant Ballard</u>**

36. Defendant Ballard served as a Company director from July 2015 until November 19, 2025. In that time, he also served as a member of the Compensation and Human Capital Committee.

37. The 2025 Proxy Statement states the following about Defendant Ballard:

> Andrew Ballard currently serves as the Chief Executive Officer and Founder of Wiser Solutions, Inc., a software and data company, a position he has held since December 2012. Mr. Ballard is also Founder of Figtree Partners, an investment firm focused on software and technology, and has served as its Managing Partner since November 2012. He was previously a Senior Advisor at the private equity firm Hellman & Friedman LLC from 2012 to 2019, where he also served as Managing Director from 2006 to 2012 and as a Director from 2004 to 2006. Prior to joining Hellman & Friedman in 2003, Mr. Ballard worked at Bain Capital, LLC in San Francisco and Boston, as well as Bain & Company, Inc. from 1994 to 2002.
>
> Mr. Ballard has served on Domino's Board of Directors since July 2015 and has served as Presiding Director since May 2022. Mr. Ballard is a member of the Compensation and Human Capital Committee of the Board of Directors.
>
> In addition to serving on Domino's Board of Directors, Mr. Ballard serves on the Boards of Directors of Etsy, Inc., Datacor, Inc. and Zignal Labs. Mr. Ballard previously served on the Boards of Directors of Activant Solutions Inc., Catalina Marketing Corporation, DoubleClick Inc., Getty Images, Inc., Internet Brands, Inc. and Vertafore, Inc. and

> was the Chair of the Board of Trustees and Chair of the Investment Committee of the San Francisco Foundation.

**Defendant Balson**

38. Defendant Balson has served as a Company director since March 1999 and also serves as a member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee.

39. The 2025 Proxy Statement stated the following about Defendant Balson:

> Andrew B. Balson is currently the Managing Partner of Cove Hill Partners, L.P., a firm formed to make private equity investments. Previously, Mr. Balson was the Chief Executive Officer of Match Beyond, an innovative college completion program that helps low-income young adults attain college degrees and prepare for the workforce, a position he held from January 2015 to June 2016. Prior to becoming the Chief Executive Officer of Match Beyond, Mr. Balson was a Managing Director at Bain Capital, LLC, a global investment company, from 2001 to 2013. Mr. Balson became a Principal of Bain Capital in January 1998.
>
> Mr. Balson has served on Domino's Board of Directors since March 1999 and is a member of the Compensation and Human Capital Committee and a member of the Nominating and Corporate Governance Committee of the Board of Directors.
>
> Mr. Balson previously served on the Boards of Directors of Bloomin' Brands, Inc., FleetCor Technologies, Inc., Dunkin' Brands, Inc., Skylark Co., Ltd., BELLSYSTEM24, Inc., Burger King Corporation and Bright Horizons Family Solutions, Inc. Mr. Balson currently serves on the Boards of a number of private companies.

**Defendant Barry**

40. Defendant Barry has served as a Company director since July 2018. She

is also the Chair of the Compensation and Human Capital Committee.

41. The 2025 Proxy Statement stated the following about Defendant Barry:

> Corie S. Barry currently serves as Chief Executive Officer and as a member of the Board of Directors of Best Buy Co., Inc., a specialty retailer of consumer electronics, personal computers, entertainment software and appliances, roles held since June 2019. Prior to becoming CEO, Ms. Barry served as Best Buy's Senior Executive Vice President and Chief Financial and Strategic Transformation Officer from June 2016 to June 2019, Chief Strategic Growth Officer from October 2015 to June 2016, Interim President of Geek Squad Services from March 2015 to May 2016, Senior Vice President of Domestic Finance from May 2013 to October 2015 and in a variety of financial and operational roles, both in the field and at the corporate campus, since joining Best Buy in 1999. Prior to Best Buy, Ms. Barry worked at Deloitte Touche Tohmatsu Limited from 1997 to 1999.
>
> Ms. Barry has served on Domino's Board of Directors since July 2018 and is the Chairperson of the Compensation and Human Capital Committee of the Board of Directors.

**<u>Defendant Brandon</u>**

42. Defendant Brandon has served as the Executive Chairman of the Board since 1999.

43. The 2025 Proxy Statement stated the following about Defendant Brandon:

> David A. Brandon has served as Chairman of Domino's Board of Directors since March 1999 and as Executive Chairman since April 2022. Mr. Brandon also served as Domino's Chief Executive Officer from March 1999 to March 2010 and as Special Advisor from March 2010 to January 2011.

> In addition to his position at Domino's, Mr. Brandon currently serves as Executive Advisor to KKR & Co., Inc., one of the world's largest private equity firms. He previously served as Chief Executive Officer of Toys "R" Us, Inc., formerly the world's largest specialty retailer of toy and baby products, from July 2015 to December 2018. He was the Director of Athletics at the University of Michigan from March 2010 to October 2014.
>
> Prior to joining Domino's, Mr. Brandon was President and CEO of Valassis, Inc., a company in the sales promotion and coupon industries, from 1989 to 1998 and Chairman of the Board of Directors of Valassis, Inc. from 1997 to 1998.
>
> In addition to serving on the Board of Directors of Domino's, Mr. Brandon also serves on the Board of Directors of DTE Energy Co., as well as several private companies and non-profit organizations. He previously served on the Boards of Directors of MillerKnoll, Inc., Toys "R" Us, Inc., Burger King Corporation, Kaydon Corporation, Northwest Airlines and The TJX Companies, Inc.

**Defendant Cantor**

44. Defendant Cantor served as a Company director from October 2005 to February 2025. She also served as a member of the Nominating and Corporate Governance Committee.

45. The proxy statement the Company filed with the SEC on April 25, 2024 (the "2024 Proxy Statement") stated the following about Defendant Cantor:

> Diana F. Cantor is currently a Partner at Alternative Investment Management, LLC, a position she has held since January 2010, and is past Chairman of the Virginia Retirement System, where she served as a Trustee and a member of the Audit and Compliance Committee from 2010 to 2020. She also serves as a Senior Adviser with AKF Consulting Group, focusing on the areas of governance, fiduciary duties and oversight of state-run investment programs.

> Ms. Cantor has served on Domino's Board of Directors since October 2005 and is a member of the Inclusion & Diversity Committee and a member of the Nominating and Corporate Governance Committee of the Board of Directors.
>
> In addition to serving on Domino's Board of Directors, Ms. Cantor serves on the public company Boards of Directors of Universal Corporation (Chairman of the Nominating and Corporate Governance Committee, member of the Compensation Committee and the Finance and Pension Investment Committee) and VICI Properties Inc. (Chair of the Audit Committee, member of the Nominating and Corporate Governance Committee), and the private company Boards of Directors of Mauser Packaging Solutions and SCP Retirement Services. She previously served on the Boards of Directors of Adore Me, Media General, Inc., Revlon, Inc., The Edelman Financial Group Inc., Vistage International, Inc., Knowledge Universe Education LLC, Edelman Financial Services, LLC and Service King Body and Paint LLC.

**Defendant Federico**

46. Defendant Federico has served as a Company director since February 2011 and is the Chairperson of the Audit Committee.

47. The 2025 Proxy Statement stated the following about Defendant Federico:

> Richard L. Federico served as Non-Executive Chairman of P.F. Chang's China Bistro, Inc. based in Scottsdale, AZ, from February 2016 until its acquisition in March 2019. Mr. Federico previously served as Executive Chairman of P.F. Chang's from March 2015 to February 2016 and as Chairman of the Board, Chief Executive Officer or Co-Chief Executive Officer from September 1997 to March 2015. Mr. Federico joined P.F. Chang's as President in 1996, when he also began his service on its Board of Directors. Mr. Federico started his career in the restaurant industry as a Manager at Steak & Ale, and later

> at Orville Beans and Bennigan's restaurants. He went on to develop Grady's Goodtimes, serving as Co-Founder/Partner and Vice President of Operations until Brinker International, Inc. acquired Grady's in 1989. Upon joining Brinker International, Mr. Federico served as Senior Vice President and concept head for Macaroni Grill before being promoted to President of the Italian Concept division. As President, he directed operations and development for Macaroni Grill and Spageddies.
>
> Mr. Federico has served on Domino's Board of Directors since February 2011 and is the Chairperson of the Audit Committee of the Board of Directors.
>
> In addition to serving on Domino's Board of Directors, Mr. Federico currently serves on the Boards of Directors of Black Rock Coffee, The Melt and Boqueria, all privately-held restaurant concepts. Mr. Federico previously served as Chairman of the Board of Directors of Jamba, Inc. and on the Boards of Directors of RPT Realty and Tastemaker Acquisition Corp. He is a Founding Director of Chances for Children.

**Defendant Goldman**

48. Defendant Goldman has served as a Company director since March 2010. Defendant Goldman also serves as a member of the Audit Committee.

49. The 2025 Proxy Statement the following about Defendant Goldman:

> James A. Goldman currently serves on three portfolio company Boards representing Eurazeo SE, a global investment firm listed on the Paris Stock Exchange, including Q Mixers, a leading premium carbonated mixer brand, Waterloo Sparkling Water Corp., a carbonated beverage company, and Dewey's Bakery, a premium baked goods company. Mr. Goldman also works with the private equity firm Frontenac as a Senior Advisor and Chairman1st Partner. Mr. Goldman served as President and Chief Executive Officer and as a member of the Board of Directors of Godiva Chocolatier, Inc. from 2004 to 2014. Mr. Goldman was President of the Food and Beverage Division at Campbell Soup Company from 2001 to 2004 and served in various executive positions

at Nabisco, Inc. from 1992 to 2000. Prior to his work at Nabisco, Mr. Goldman was a senior consulting associate at McKinsey & Company, Inc.

Mr. Goldman has served on Domino's Board of Directors since March 2010, and is a member of the Audit Committee of the Board of Directors.

In addition to serving on Domino's Board of Directors, Mr. Goldman serves on the Board of Directors of Abercrombie & Fitch Co., where he is a member of the Compensation Committee and Chair of the Nominating and Corporate Governance Committee. Mr. Goldman previously served on the Board of Directors of The Children's Place, Inc. He also served on the Board of Trustees and Executive Committee of Save the Children in Fairfield, CT, the Executive Board of the International Tennis Hall of Fame, and the Board of Trustees at the YMCA Camps Becket and Chimney Corners in Becket, MA.

**Defendant Lopez**

50. Defendant Lopez has served as a Company director since July 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee.

51. The 2025 Proxy Statement stated the following about Defendant Lopez:

Patricia E. Lopez most recently served as Chief Executive Officer and as a member of the Board of Directors of High Ridge Brands Co. from July 2017 to March 2020. Ms. Lopez served as a Senior Vice President at Estée Lauder Companies Inc. from January 2015 to July 2016, a Senior Vice President at Avon Products, Inc. from December 2012 to November 2014 and previously held various positions at The Procter & Gamble Co. for 25 years, most recently serving as a Vice President and General Manager overseeing its Eastern Europe business.

Ms. Lopez has served on Domino's Board of Directors since July 2018 and is the Chairperson of the Nominating and Corporate Governance

Committee and a member of the Audit Committee of the Board of Directors.

In addition to serving on Domino's Board of Directors, Ms. Lopez also serves on the Boards of Directors of Aramark and Recreational Equipment, Inc. (REI). She previously served on the Board of Directors of Acreage Holdings and Express, Inc.

**Relevant Non-Parties**

52. The amended complaint in the Securities Class Action captioned *State of Rhode Island Office of the General Treasurer v. Dominos Pizza, Inc. et al*, Case No.: 2:24-cv-12477-LVP, in the United States District Court for the Eastern District of Michigan (Detroit), incorporates statements from confidential witnesses ("CWs") of Dominos who offered their experiences.[3]

***CW1***

53. CW1 previously served the Company as a DPE franchisee in South Australia for roughly eighteen years, from 2006 to 2024.

***CW2***

54. CW2 has served the Company as a DPE franchisee in Australia since 2013.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

55. By reason of their positions as officers, directors, and/or fiduciaries of

[3] Confidential witnesses are all referenced using masculine pronouns to maintain their confidentiality.

Domino's and because of their ability to control the business and corporate affairs of Domino's, the Individual Defendants owed Domino's and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Domino's in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Domino's and its shareholders so as to benefit all shareholders equally.

56. Each director and officer of the Company owes to Domino's and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Domino's, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58. To discharge their duties, the officers and directors of Domino's were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary

duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Domino's, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

60. As senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all

those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

61. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Domino's were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Michigan, and the United States, and pursuant to Domino's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Domino's conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to

correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Domino's and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Domino's operations would comply with all applicable laws and Domino's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of

the subjects and duties set forth above.

62. Each of the Individual Defendants further owed to Domino's and the shareholders the duty of loyalty requiring that each favor Domino's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

63. At all times relevant hereto, the Individual Defendants were the agents of each other and of Domino's and were at all times acting within the course and scope of such agency.

64. Because of their advisory, executive, managerial, directorial, and controlling positions with Domino's, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

65. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Domino's.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct,

and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

67. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

68. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Domino's was a

direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

70. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Domino's and was at all times acting within the course and scope of such agency.

## DOMINO'S CODE OF CONDUCT

71. Domino's Code of Business Conduct and Ethics for Directors, Officers and Employees (the "Code of Conduct") states the following, with respect to its purpose:

> The stockholders, team members, customers, vendors and other business partners of Domino's Pizza, Inc. (the "Company") rely on the honesty and integrity of the Company's Board of Directors. To support this trust, the Directors, officers and employees of the Company must commit themselves to the following Code of Business Conduct and

Ethics for Directors, Officers and Employees (this "Code").

72. In the section "Compliance with Laws, Rules and Regulations" the Code of Conduct states:

> The Company requires strict compliance by its Directors, officers and employees with applicable laws, rules and regulations, including insider trading laws. Pursuant to the Company's Insider Trading Policy, the Company prohibits its Directors, officers and employees from trading, either personally or on behalf of others, in securities on the basis of material non-public information. The Company also prohibits Directors, officers and employees from communicating material, non-public information to others so they may trade in securities on the basis of that information.

73. In the section "Full and Fair Disclosure," the Code of Conduct states:

> The Company is committed to full compliance with all requirements applicable to its public disclosures, including reports filed or furnished to securities regulators. All of the Company's business communications should be timely, clear and accurate. It is a violation of this Code to misrepresent the Company's financial performance or otherwise compromise the integrity of its financial statements or other disclosures.

74. In the section "Reporting Illegal or Unethical Behavior" the Code of Conduct states:

> Directors, officers and employees should communicate any suspected violations of laws, rules, regulations or this Code to the Chair of the Nominating and Corporate Governance Committee or the Chair of the Board of Directors. The Company will not allow retaliation for any such reports that are made in good faith. The Company is committed to prompt, consistent and appropriate enforcement of this Code and is committed to taking appropriate enforcement action as designed to maintain compliance with this Code and with all applicable laws, rules

and regulations.

75. In the section "Wavier" The Code of Conduct states:

> Any waiver of this Code for Directors or executive officers must be made by the Nominating and Corporate Governance Committee or the full Board of Directors and must be, along with the reasons for the waiver, promptly (and in any event within four business days) disclosed to the Company's stockholders in accordance with applicable laws, rules and regulations.

***Code of Professional Conduct for Senior Financial Officers***

76. Domino's also maintains an independent "Code of Professional Conduct for Senior Financial Officers" (the "Financial Officers Code of Conduct"). The Financial Officers Code of Conduct states that Domino's CEO and Senior Financial Officers will:

- Act with honesty and integrity and ethically handle any actual or apparent conflicts of interest in personal and professional relationships;
- Provide stakeholders with information that is accurate, complete, objective, relevant, timely and understandable;
- Comply with rules and regulations of federal, state, provincial and local governments, and other appropriate private and public regulatory agencies;
- Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing one's independent judgment to be subordinated;
- Respect the confidentiality of information acquired in the course of one's work except when authorized or otherwise legally obligated to disclose any such information;
- Not use confidential information acquired or obtained in the course of one's work for personal advantage;

- Share knowledge and maintain skills important and relevant to stakeholder's needs;
- Proactively promote and be an example of ethical behavior as a responsible partner among peers, in the work environment and the community; and
- Achieve responsible use of and control over all assets and resources employed or entrusted.

77. In violation of the Code of Conduct and the Financial Officers Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct or the Financial Officers Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct and the Financial Officers Code of Conduct.

## DOMINO'S AUDIT COMMITTEE CHARTER

78. Domino's also maintains an Audit Committee Charter (the "Audit

Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The Audit Committee (the "Audit Committee") of the Board of Directors of Domino's Pizza, Inc. (the "Company") shall: (a) appoint, replace and oversee the Company's independent auditor; (b) oversee the internal and external audit process, including the scope and implementation of the annual audit; (c) assist the Board of Directors in its oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the performance of the Company's internal audit function and the adequacy of the Company's system of internal controls, (iv) the independent auditor's qualifications, independence and performance, and (v) compliance with the Company's Code of Business Conduct and Ethics for Directors, Officers and Employees and Code of Professional Conduct for Senior Financial Officers; and (d) prepare the audit committee report that the Securities and Exchange Commission (the "SEC") rules require to be included in the Company's annual proxy statement.

79. Under the section "Responsibilities and Powers of the Audit Committee," the Audit Committee Charter states the following, in relevant part:

> The responsibilities and powers of the Audit Committee are as follows
>
> ***
>
> C. Oversight of Financial Statements
>
> (1) Review and discuss with management, the internal audit group and the independent auditor the Company's system of internal control over financial reporting and its accounting practices. Resolve any disagreements, if any, between management and the independent auditor.

***

(4) Review with management and the independent auditor the annual and quarterly financial statements and Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q before filing with the SEC. Review with management the remaining portions of the Form 10-K and each Form 10-Q and any other document filed with the SEC and distributed to stockholders prior to filing or distribution.

(5) Discuss the results of the annual audit and quarterly reviews and any other matters required to be communicated to the Audit Committee by the independent auditor under generally accepted auditing standards and PCAOB Auditing Standard 16, and management's response to any problems or difficulties.

(6) Review and discuss the types of financial information to be included in earnings press releases and in earnings guidance, if any, provided to stockholders, analysts and rating agencies.

(7) Review pending legal proceedings and other known contingent liabilities that are communicated by management to the Audit Committee as potentially having a material effect on the Company's financial statements.

***

F. Risk Assessment

(1) Assess, review, evaluate and discuss with management the Company's risk assessment and risk management policies and program.

(2) Receive a presentation from management/internal auditor on the Company's annual risk assessment and review risk management items as necessary with management or the internal audit director, as applicable.

(3) Receive periodic updates from management and the information

security team relating to the Company's information systems security.

G. Oversight of the Company's Compliance Program

(1) Review the process of communicating the Company's Code of Business Conduct and Ethics to team members and the Code of Professional Ethics for Senior Financial Officers to finance team members and the process for overseeing team member compliance and procedures for the receipt, retention and treatment of complaints relating thereto.

(2) Review compliance with and the process of assuring the Company's compliance with laws and regulations, including, but not limited to, applicable Nasdaq Stock Market listing standards, SEC rules and regulations, the Foreign Corrupt Practices Act, the Sarbanes Oxley Act of 2002 and the Dodd-Frank Wall Street Reform and Consumer Protection Act.

H. General Responsibilities

(1) Report regularly to the Board of Directors.

(2) Review the adequacy of this Charter annually and submit any proposed amendments to the Board of Directors for approval.

(3) Conduct and present to the Board of Directors an annual evaluation of the performance of the Audit Committee.

(4) Prepare such reports as required by SEC rules.

(5) Perform any other activities consistent with this Charter, the Company's Certificate of Incorporation and By-laws and governing law as the Board of Directors or the Audit Committee shall deem appropriate.

80. Under the section titled "Other Areas of Review" the Audit Committee Charter states the following:

The Audit Committee will review other areas, as it deems necessary,

including:

A. Employee Benefit Plans. The Audit Committee shall review with the independent auditor of the Company's employee benefit and retirement plans (the "Benefit Plans Independent Auditor") and management the results of the Benefit Plans Independent Auditor's annual audit of the Company's employee benefit plans.

B. 401(k) Plan. The Audit Committee shall review the results of the Benefit Plans Independent Auditor's annual audit of the Company's 401(k) plan and receive a report from management on management's process to ensure the 401(k) plan is in compliance with applicable laws, rules and regulations.

C. Tax Returns. The Audit Committee shall review with management and the Company's tax advisors the status of tax returns, including open years and potential disputes, and it shall review with the independent auditor the adequacy of tax reserves included in the Company's financial statements.

D. Fraudulent or Illegal Activities. The Audit Committee shall review the circumstances of any fraudulent or illegal activities that may be discovered, and any preventative action taken in response to such activities. It shall initiate an investigation of any special situation, if warranted.

E. CEO Expenses. The Audit Committee shall review and approve the expenses of the CEO at least annually.

81. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement,

abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

82. Domino's was founded in 1960, and the Company now describes itself as the largest pizza company in the world.

83. Domino's is a globally recognized brand and now has more than 21,300 stores in over 90 different markets and had reported over $19.1 billion in global retail sales in 2024.

84. The Company has developed innovative ordering platforms for their food, and more than 85% of the Company's retail sales in 2024 came from these digital channels.

85. The Company operates on a franchise model, and the Company's largest "master franchisee" is DPE. As of December 31, 2023, DPE operated 3,840 stores in 12 international markets, accounting for approximately 28% of the

Company's international store count and 19% of its global store count.

86. The Company generates revenue and earnings through royalties and fees charged to its franchisees. Domino's also generates revenue and earnings through the sale of food, equipment, and other supplies to franchisees, as well as through the operation of Company-owned stores throughout the United States. Franchisees generate revenue and earnings through the sale of pizza and other complimentary items to customers.

**Domino's International Business**

87. The Company conducts a significant portion of its business internationally through its franchise network, which encompassed 13,737 stores as of December 31, 2023. International markets included in the international profile of The Company include Australia, Germany, Kuwait, Saudi Arabia, Israel, and France. As noted above, the primary source of revenue to the Company from such franchises are royalty payments and certain technology fees."

88. Most of the Company's operations in international markets are conducted by its master franchisees, who as noted above acquire the geographic rights to operate Company stores for entire regions or countries. Master franchisees generally utilize the Company's standard operating model and modify it to suit their respective regions as needed, namely in the context of appealing to local cultures

and demand.

89. In addition to paying the Company royalties and technology fees, master franchisees must typically pay a single-time franchise fee. Master franchisees are also expected to pay subsequent franchise fees for the opening of further Domino's locations.

90. Notably, prior to the start of the Relevant Period, the Company's international market was growing at a more rapid pace than its stores in the United States. By the beginning of 2023, over two-thirds of the Company's stores were international. As such, the Company considered its international market as a greater source of future growth as compared to the market in the United States.

**<u>Domino's Pizza Enterprises</u>**

91. DPE was established in 1983, and publicly trades on the Australian Securities Exchange under the ticker "DMP." At the close of 2023, DPE operated 3,840 stores across twelve international markets and accounted for roughly 28% of the Company's international stores and roughly 19% of its global stores.

92. DPE's largest international market is Japan, in which it operates 1,015 stores. Notably Japan was the Company's third largest international market as of the close of 2023. In addition, DPE is based in the Australian market which is the Company's sixth largest international market. DPE also controls the French market,

which is Domino's ninth largest international market.

**Prior to the Start of the Relevant Period, Domino's Experienced Significant Challenges**

93. The Company's stock was among the best performing on the market from its initial trading date in 2004 through 2021. However, this financial trajectory would shift dramatically between the close of 2021 through the start of 2023.

94. For instance, following the Company's reported financial results for 2022, the Company's price per share dropped from $564.33 per share to $294.01 per share from December 31, 2021 through February 28, 2023. This drop represented a decline in the Company's value of 48% and a loss of roughly $10.2 billion in market capitalization.

95. The Company's declining financial performance occurred in both its U.S. and international markets. Given these unsatisfactory metrics, the Company's stock price was in a position to rise with even the most lukewarm news. Thus, as 2023 progressed, the Company's stock price began to gradually recover which was noted by analysts such as *Barclays* and *Oppenheimer*. Notably, *Oppenheimer* published an article on July 24, 2023 in which it increased its price target for Domino's stock from $400 to $427. Also on July 24, 2023, *Barclays* published an article in which it raised its price target for Domino's stock from $270 per share to

$320 per share.

96. Given this positive swing in the Company's financial trajectory, the Individual Defendants possessed significant motivation to prevent the Company's stock price from declining to its previous lows. As such, prior to the start of the Relevant Period, the Individual Defendants continued to downplay the problems Domino's and its franchisees were experiencing, and thus misrepresented the expected growth of its international business.

97. Although DPE disclosed in June 2023 that it would be closing a number of its locations in France and Japan due to unsatisfactory performance, the Individual Defendants continued to convey confidence in the growth of the Company's international business. For instance, Defendant Reddy represented Domino's at the Oppenheimer Consumer Growth & E-Commerce Conference on June 14, 2023. At the conference, Defendant Reddy stated that Domino's international store closures were "idiosyncratic," and asserted that its gross openings were "very strong[.]"

98. Likewise, on September 13, 2023, the Individual Defendants represented the Company at the Piper Sandler Growth Frontiers Conference. During the conference, an analyst asked a question pertaining to international store openings and closings. Defendant Reddy downplayed the issue of store closings by stating "I think the growth momentum on the international markets is very strong."

99. The Individual Defendants' obfuscation of the Company's growing financial issues continued at its Investor Day held on December 7, 2023, the first day of the Relevant Period. Notably, the Company issued an unattainable long-term global net store growth guidance which called for, *inter alia*, the addition of 1,100 stores annually. The Individual Defendants stressed that this unrealistic expectation was only a minimum, as Defendant Weiner stated at Investor Day "again, 1,100 is the floor. We're looking to deliver more."

100. At the same time, the Individual Defendants downplayed the extent of DPE's financial problems. During Investor Day, Defendant Reddy noted that "this year has been characterized by a number of idiosyncratic closures[,]" but added "[h]opefully, most of that is the rear view mirror."

**DPE's Poor Business Practices**

101. As confirmed by confidential witnesses in the Amended Securities Class Action, Domino's master franchisee DPE engaged in shoddy business practices which substantially inhibited profitability.

102. CW1, a former DPE franchisee in South Australia, asserted that the vast majority of DPE's franchisees, including himself, did not turn a profit. CW1 explained that DPE instituted burdensome restrictions on franchisees, namely price controls on pizza which lost money. Moreover, CW1 stated that despite DPE's

representations to franchisees that they would break even after $10,000 in sales over the course of a single week, in actuality franchisees would have to perform between $32,000 and $38,000 to break even. This discrepancy was largely due to the cost of rent in various locations, and as a result many DPE franchises failed to see profit.

103. CW1 explained that "I couldn't make any money as a franchisee and I worked so hard. I did everything that the other good franchisees did and what DPE told us. DPE killed the business by charging too many fees and too many promotions at a loss like the $15 pizzas." CW1 further added that "I gave my life to DPE for all those years and walked away with nothing. No money, no nest egg."

104. Moreover, CW1 reported that DPE continued to make money despite the unprofitability of its franchises as it would continually build new stores and lease them to new franchisees. CW1 noted that the business strategy was "corrupted because DPE would make money at the expense of franchisees." According to CW1, this practice occurred each year he was associated with DPE, and that it occurred "more so over the last 10 years." As a result, CW1 noted that franchisees frequently "walked away," which "happened a lot."

105. CW1 further explained that DPE skirted documentation of its business practices by solely speaking to franchisees directly and prohibiting franchisees from recording or writing down the contents of their meetings with DPE. CW1 noted that

DPE was "smart because they had good lawyers and they always made sure that anything they told us could not be used against them later on."

106. Likewise, CW2 detailed many of the same experiences as CW1 with regard to DPE's poor business practices. CW2 reported that he was "not happy with DPE because they have been squashing the profitability of our stores over a long period." Although CW2 remains a DPE franchisee in Australia and has owned up to seven Company stores at one point in time, he noted that he has had to sell several due to a lack of future viability. Moreover, CW2 stated that he was in the process of selling the remainder of his Company stores.

107. CW2 went on to assert that "the guys who run DPE have been incompetent since I joined in 2013." CW2 described DPE's former CEO Don Meij as "delusional" and added that "DPE was in shambles because Don [Meij] wanted to grow it at such a pace that is could not ever make any money." According to CW2, former CEO Meij required that sites were "built to such a high standard that new franchisees could never be profitable."

108. The experiences of CW1 and CW2 were shared by other DPE franchisees. CW2 recounted that he "went to all the franchisee meetings and nobody was making enough money." Further, CW2 stated that "new stores were not being bought by existing franchisees because we knew that you could not make money.

Building and franchisor costs were too high."

109. Regarding DPE's operation in Japan, CW2 reported that it "had big numbers of store openings in Japan off the back of the Olympics and COVID but it went completely the other way. The Japanese just didn't want pizza." With regard to DPE's operations elsewhere, CW2 stated that DPE's outside of Germany and Australia "were losing money big time."

## FALSE AND MISLEADING STATEMENTS

***December 7, 2023 Investor Day***

110. On December 7, 2023, Domino's hosted its 2023 Investor Day. During the 2023 Investor Day presentation, the Individual Defendants provided investors with the Company's purported long-term guidance for 2024 through 2028.

111. During the presentation, Defendant Weiner provided opening remarks in which he described global store net growth and stated "[a]gain, we're going to go away from a range to a number. 1,100 around the world. These are net numbers and Sandeep will break down the US and international. I'll look for you in a little bit, but again, 1,100 is the floor. We're looking to deliver more."

112. Also during the 2023 Investor Day presentation, Defendant D'Elia provided opening remarks and stated:

> Now, we're really excited obviously to expand our international store portfolio to over 18,500 stores in the next five years. But what we're even

> more excited about is the long-term growth potential of our international business. We routinely conduct a number of analyses to help us estimate the full store potential of our international business. These are analyses such as sales and stores per capita, share of wallet, share of the pizza and QSR categories, et cetera. And when you triangulate these different analyses, what they show is the estimated full store potential of our international business is over 40,000 stores. So that means even with all the store growth that we're going to deliver over the next five years, we will still have less than 50% of the estimated full store potential of our international business.

113. Defendant Reddy also provided opening remarks during the 2023 Investor Day Presentation in which he stated:

> [I]nternational, we expect again to do 925 plus stores in international. I think this year has been characterized by a number of idiosyncratic closures. Hopefully, most of that is the rear view mirror. And as we move forward next year, with all the initiatives that we're talking about, we should be back on track with the 925, at least in 2024, and then accelerate from there to do more beyond that.

114. During the 2023 Investor Day Presentation, Defendant Weiner discussed net store growth guidance and stated:

> On the international side, I said this in the Q3 call, a lot of that was driven by closures and kind of onetime special closures. If you take out some of the closures from Domino's Pizza Enterprises and Russia, I think we only closed like 15 stores in Q3. And so those onetime things will get behind us. And that's essentially why we gave a floor with more because if we think about guidance, we want you to understand where we're getting back to and that we're going to continue to grow.

115. Also during Investor Day, an analyst asked whether the "very big number" which Domino's conveyed for international store growth "require[d] a lot

more new markets versus the ones you're already in." In response, Defendant D'Elia stated that "the shape of our store growth [over the longer term] should follow a very similar pattern to how I explained it over the next five years." Defendant D'Elia then discussed less developed markets and reassured investors by stating:

> I don't want you to take away that we don't have headroom left in our developed markets. So I'll also unpack those a little bit. . . . We still have tons of headroom in France and Germany. Those are bit market potentials for us. And then Japan, who just opened up their 1,000th store, but we also think that we have big potential on that market.

116. In addition to the Individual Defendants' remarks, the Company provided graphics during the 2023 Investor Day presentation. These graphics represented the Company's strategy to add "MORE STORES" as well as "New Guidance" for "Annual Global Net Unit Growth" of "1,100+" stores:



117. The Company's new long-term guidance is referenced on the following six slides of the 2023 Investor Day presentation: "New Long-Term Guidance Drives More (2024-2028)"; "Hungry for More' in Context – Growth Under New Guidance (2024-28)"; "Longer-Term, the Runway for International Store Growth is Immense," "New Long-Term Guidance Drives More (2024-2028)"; "More Stores"; and "We Are Just Getting Started." On the slide titled "Longer-Term, the Runway for International Store Growth is Immense," the Individual Defendants stated that the Company's "2028 Target" for total international stores is "~18,500+ stores" and its "Long-Term Potential" is "40,000+ Stores."

118. The 2023 Investor Day presentation also featured a slide titled "More Stores," which added that Domino's long-term guidance included 925+ "International Annual Net Store Growth" and "5,500 + Incremental" global net store growth by 2028:




119. Further, the 2023 Investor Day presentation featured a slide titled "Unmatched Portfolio of International 'Master Franchisees'" provided Domino's "Latest Medium-Term Store Growth Guidance" for DPE as being 7,100 stores by 2033:

**Unmatched Portfolio of International "Master Franchisees"**

| | Public Master Franchisees | Market Cap ($B) | Listing | Current Stores | Latest Medium-Term Store Growth Guidance |
|---|---|---|---|---|---|
| JUBILANT FOODWORKS | Jubilant FoodWorks Ltd. | $4.2 | JUBLFOOD (NSE) | 1,961 | 3,000 by 2029 |
| DOMINO'S PIZZA ENTERPRISES LIMITED | Domino's Pizza Enterprises Ltd. | $3.0 | DMP (ASX) | 3,782 | 7,100 by 2033 |
| Alsea | Alsea S.A.B. de C.V. | $2.8 | ALSSF (BMV) | 1,401 | 2,000+ by 2027 |
| DOMINO'S PIZZA GROUP PLC | Domino's Pizza Group PLC. | $2.0 | DOM (LON) | 1,288 | +200 in Med. Term |
| Domino's Pizza 达美乐比萨 | DPC Dash Ltd. | $1.0 | 1405 (HK) | 716 | +240 in 2024 |
| alamar الأمار | Alamar Foods Co. | $0.8 | 6014 (TADAWUL) | 600 | - |
| Domino's DP Eurasia N.V. | DP Eurasia N.V. | $0.1 | DPEU (LON) | 691 | 1,250 Total |
| | **Total** | **~$14B** | | **~10,500** | |

Sources: Respective Investor Relations websites, company filings, and supplemental store count disclosures. Market capitalization numbers as of Sept. 8 (except Alamar and DPC Dash as of Sept. 7) and adjusted for local currency. Store count data as of latest release as of 10/25

ALL RIGHTS RESERVED © 2023 DOMINO'S PIZZA LLC | 2023 DOMINO'S INVESTOR DAY

***January 8, 2024 ICR Conference***

120. On January 8, 2024, Defendants Weiner and Reddy represented the Company at the ICR Conference.

121. At the ICR Conference, an analyst asked a question concerning the Company's plan to attain its previously stated guidance, namely the acceleration of net store growth. In response, Defendant Reddy stated "on the international business, we talked about some idiosyncratic closures that we've experienced in 2023 that really, hopefully, are mostly behind us as we go into 2024. And those are the two tailwinds, in particular, that actually help us as we move forward."

***February 26, 2024 Press Release***

122. On February 26, 2024, the Company issued a press release (the "Q423

Earnings Press Release") announcing the Company's fourth quarter ("Q423") and fiscal 2023 financial results.

123. The Q423 Earnings Press Release stated "[t]he Company hosted its Investor Day on December 7, 2023, and announced the following long-term guidance metrics that the Company continues to expect to achieve," including "1,100+ [a]nnual global net store growth."

124. The Q423 Earnings Press Release also quoted Defendant Weiner who reinforced the Company's guidance by stating that Domino's "Hungry for MORE strategy" that "we recently unveiled at our Investor Day, is our plan to deliver MORE sales, MORE stores and MORE profits."

***2023 Form 10-K***

125. On the same day, the Company filed its 2023 Annual Report Form 10-K with the SEC, reporting financial results for 2023 (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Reddy, Weiner, Brandon, Ballard, Balson, Barry, Cantor, Federico, Goldman, and Lopez and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Weiner and Reddy attesting that "the information contained in the [2023 Form 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

126. With respect to the risks pertaining to the Company's ability to achieve its growth strategy, the 2023 Form 10-K stated:

> ***If we fail to successfully implement our growth strategy, which includes opening new stores and generating more sales, our ability to increase our revenues and operating profits could be adversely affected. …***
>
> Our failure to add new stores would adversely affect our ability to increase revenues and operating income. Additionally, our growth strategy and the success of new stores depend in large part on the availability of suitable store sites and leases. We and our franchisees are currently planning to expand our U.S. and international operations in many of the markets where we currently operate and in select new markets. This may require considerable management time as well as start-up expenses for market development before any significant revenues and earnings are generated. Operations in new markets may achieve low margins or may be unprofitable, and expansion in existing markets may be affected by local economic and market conditions. In addition, we expect to continue our strategy of building additional stores in markets and regions where we have existing stores, a strategy we refer to as "fortressing," which may negatively impact sales at existing stores. Therefore, as we continue to expand, we or our franchisees may not experience the gross margins we expect, our results of operations may be negatively impacted, and our stock price may decline.[4]

127. The 2023 Form 10-K also discussed the risks pertaining to the Company's reliance on the success of its franchisees, and noted DPE in particular. At the time, DPE was the Company's "largest international master franchisee [and] operated 3,840 stores in 12 markets, which accounted for approximately 28% of our

---

[4] All emphasis herein is added unless stated otherwise.

total international store count." The 2023 Form 10-K stated:

> ***Our earnings and business growth strategy depend on the success of our franchisees, and we may be harmed by actions taken by our franchisees, or employees of our franchisees, that are outside of our control. …***
>
> Our international master franchisees are generally responsible for the development of significantly more stores than our U.S. franchisees. As a result, our international operations are more closely tied to the success of a smaller number of franchisees than our U.S. operations. As of December 31, 2023, our largest international master franchisee operated 3,840 stores in 12 markets, which accounted for approximately 28% of our total international store count. Our U.S. and international franchisees may not operate their franchises successfully. If one or more of our key franchisees were to be unsuccessful, become insolvent or otherwise were unable or unwilling to pay us our royalties or other amounts owed, our business and results of operations would be adversely affected.

***February 26, 2024 Earnings Call***

128. On the same day, the Company hosted an earnings call (the "Q423 Earnings Call") with analysts and investors to discuss its financial results for the fourth quarter and full year of 2023.

129. During the Q423 Earnings Call, Defendant Weiner stated "Hungry for MORE is our new strategy around what we're going to do to deliver over the course of the next five years, more sales, more stores and more profits.".

130. Also during the Q423 Earnings Call, Defendant Reddy stated "[i]nternationally, we are expecting to increase net store growth each quarter over the prior year, as we lap the one-time closures we had in 2023 and to step up

significantly in the back half of the year."

131. During the Q423 Earnings Call, an analyst asked a question concerning the Company's confidence in the acceleration of global unit growth given that in the past quarter international was "a little bit on the softer side." Defendant Weiner responded by stating that "[w]e still feel really strongly about the guidance we gave, the 1,100-plus stores and 5,500 over the next five years." Defendant Weiner further stated that "[i]nternationally, I think we've got a lot of closures behind us. That was probably one of the things that was driving down the number this year. But those closures are really focused on three areas," namely "Domino's Pizza Enterprises." Defendant Weiner concluded by stating "as we look forward, we feel really confident about openings."

132. Defendant Reddy also responded to the analyst's question by stating that

> we're expecting to actually grow against last year as we lap the closures and then significantly accelerate more in the back half of the year. So, very confident in where we are with store openings international. And we've been talking to our master franchisees and have good visibility to our expectations there.

133. An analyst on the Q423 Earnings Call later asked a question pertaining to a slowdown in the Company's performance in Europe. In response, Defendant Weiner stated:

> Our European business is really strong, and we believe some of the pressures we're seeing there are generally transitory in nature. If you listen to the call from DPE, Domino's Pizza Enterprises, our master franchisee over several markets, but especially France, there have been some challenges there, and that's one of our larger markets in Europe. We're partnering closely with them right now on those challenges. What I'd point to for DPE in general, there are green shoots in a lot of the markets where they're really leaning in on. And so, for example, Australia, New Zealand, the numbers there have been fantastic." He added, DPE "give[s] a little insight into Japan into the first kind of six, seven weeks of the second half and how that seems to have turned a corner.

***March 15, 2024 Annual Report to Security Holders***

134. On March 15, 2024, the Company filed with the SEC its 2023 Annual Report to Security Holders with the SEC, which included a letter addressed to the Company's shareholders and signed by Defendant Weiner.

135. In the letter, Defendant Weiner represented to shareholders that "[o]ur team members, franchisees and executive team are Hungry for MORE, and this confidence is reflected in our updated and more aggressive outlook for the next five years." Defendant Weiner also stated in the letter that "[w]e aim to open 1,100+ net new stores annually worldwide, bringing us to at least 5,500 additional stores over the next five years."

136. Defendant Weiner ended the letter by asserting "with the launch of our Hungry for MORE strategy, our ambition and confidence in our brand and Domino's

ability to win has never been higher. Our intent is to translate more sales, more stores and more profits into more shareholder returns. That is the ultimate measure of our success."

***April 29, 2024 Press Release***

137. On April 29, 2024, the Company issued a press release (the "Q124 Earnings Press Release") announcing its financial results for the first quarter of 2024 ("Q124"). The Q124 Earnings Press Release quoted Defendant Weiner as stating:

> Our first quarter results demonstrated that our Hungry for MORE strategy is off to a strong start: delivering MORE sales, MORE stores, and MORE profits,
>
> ***
>
> We are laser focused on driving franchisee profitability and store growth, which will fuel the Company's ability to win and create meaningful long-term value for our shareholders.
>
> ***
>
> The Company continues to expect to achieve the following long-term guidance metrics previously announced[, including] . . . 1,100+ Annual global net store growth . . .

***April 29, 2024 Earnings Call***

138. On the same day, the Company hosted an earnings call (the "Q124 Earnings Call") with analysts and investors to discuss its first quarter results.

139. On the Q124 Earnings Call, Defendant Weiner stated "[o]ur Q1 results demonstrated that our Hungry for MORE strategy is delivering on its promise,

driving MORE sales, MORE stores and MORE profit." Defendant Weiner added that "[o]ur first quarter results clearly show that our strategy is resonating with customers. This gives me great confidence that we can deliver against our short- and long-term Hungry for MORE goals and drive significant value creation for our shareholders."

140. Also on the Q124 Earnings Call, Defendant Reddy commented on the net store growth of the Company, stating that the Company "continue[d] to expect 1,100 or more, which will be driven by 175 in the U.S. and 925 in international[.]"

***April 29, 2024 Form 10-Q***

141. On April 29, 2024, the Company filed its quarterly report on Form 10-Q with the SEC concerning its financial results for the quarter ended March 24, 2024 (the "Q124 10-Q"), which was signed by Defendant Reddy. Attached to the Q124 10-Q were SOX certifications signed by Defendants Weiner and Reddy attesting that "the information contained in the [Q124 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

142. The Q124 10-Q stated that "[r]evenues from international franchise royalties and fees increased $2.3 million, or 3.3%, in the first quarter of 2024 primarily due to an increase in the average number of international franchised stores open during the period resulting from net store growth, as well as higher same store

sales."

143. The Q124 10-Q further stated that "Domino's experienced global retail sales growth during the first quarter of 2024, driven by same store sales growth and net store growth in both our U.S. and international businesses. These factors also contributed to an increase in income from operations."

***May 30, 2024 Bernstein Strategic Decisions Conference***

144. On May 30, 2024, Defendant Weiner represented the Company at the Bernstein Strategic Decisions Conference. During the conference, an analyst asked a question concerning the logic behind the over- and under- performance of certain international markets. Defendant Weiner responded by stating that DPE "just had an investor meeting the other day and they talked about some positive things and how they're turning around and part of the way they're turning around Australia is through Hungry for MORE and really driving food deliciousness."

145. Also during the Bernstein Strategic Decisions Conference, Defendant Weiner discussed his main takeaways from the conference. Defendant Weiner stated "[i]t's all about Hungry for MORE strategy. It's MORE sales, MORE stores, MORE profit. That's what Hungry for MORE is there to deliver. Hopefully you understood that, maybe a secret weapon for us is this carryout thing people don't really know much about and how is driving store growth."

***June 10, 2024 Oppenheimer Consumer Growth and E Commerce Virtual Conference***

146. On June 10, 2024, Defendant Reddy represented the Company at the Oppenheimer Consumer Growth and E Commerce Virtual Conference. At the conference, an analyst asked a question concerning the driving factors behind the Company's confidence in its guidance. In response, Defendant Reddy stated "I think from a store count perspective, we're expecting to do 1,100 stores per year."

147. Another analyst asked for further clarification as to why international remained such a significant engine of growth for the Company and what factors gave it confidence that it can achieve its long-term net store guidance. Defendant Reddy responded by stating "I think in the long term, there's plenty of potential. We have 90-plus markets and we have significant master franchisees across our network."

148. Later on during the Oppenheimer Consumer Growth and E Commerce Virtual Conference, Defendant Reddy discussed the pressure which DPE's performance was having on the Company. Defendant Reddy stated "it doesn't change the long-term trajectory of the business and the equation of where we can actually take the business. So, overall, we feel pretty good about it."

149. Defendant Reddy added that "longer-term, I think we're very confident. The markets in which we are operating, we actually have great presence in, we have our share gain possibilities which are pretty significant in most of the markets in

which we operate. And that will come through unit growth."

150. The statements in ¶¶110-149 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) DPE was experiencing significant challenges with respect to both new store openings and closures of existing stores; (ii) as a result, the Company was unlikely to meet its long-term guidance announced in the 2023 Investor Day presentation for global annual net store growth; and (iii) the Company's business and/or financial prospects were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**THE TRUTH EMERGES**

151. The truth fully emerged on July 18, 2024 when the Company issued a press release announcing its financial results for the second quarter of 2024 (the "Q224 Earnings Press Release").

152. The Q224 Earnings Press Release followed a disclosure by DPE that it would shut down roughly 80 underperforming stores in Japan and roughly 20 to 30 stores in France and provide new guidance regarding its own store openings. In pertinent part, the Q224 Earnings Press Release stated:

International: The Company expects it will fall 175 to 275 stores below

> its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises ("DPE"), one of its master franchisees. The Company is partnering closely with DPE as they work through this process and will provide further updates once it has more visibility into the effect on its annual global net store growth numbers.

153. In addition to this disclosure, the Company reported that it was "temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net store growth are known."

154. That same day, the Company hosted an earnings call to discuss the second quarter financial results (the "Q224 Earnings Call"). On the Q224 Earnings Call, when asked about the disappointing new store guidance, Defendant Reddy stated:

> And so I think when you go back to the Investor Day back in December, I think one of the process that we went through was working with all of our master franchisees, including DPE, on the expectations that they had for the business. And we basically calibrated to that for both 2024 and the five-year horizon as well. And at that time, we were completely aligned. So then actually we got into the end of the Q1 call and then we got into the second quarter and we started seeing that relative to our expectations and cadence, both new store openings as well as closures, really started increasing from DPE.
>
> And as we saw that, we continued to engage with the DPE team to validate the forecast that we had for the year. And it became pretty clear as we actually went through that conversation and discussion that there was not only the risk to the second quarter that we were seeing, but

> clearly the outlook was going to be impacted as well. And in fact, just yesterday I think DPE put out a release with a number of closures that they outlined in the Japan and France market in particular, which they're targeting for their first half, which is our second half, which therefore will land in this fiscal year. So apart from what we've seen in second quarter, we expect to see more pressure in the second half of this year.

155. On this news, Citigroup published an article on July 18, 2024, in which it explained "the crux of the frustration will stem from a suspension of unit growth guidance merely 8 months after [Domino's] issued new longer-term targets." The Citigroup article stated the following with regard to the Company's store closures: "this unexpected update will shake investor confidence in the company's broader guidance and put pressure on a stock that has held a premium multiple vs. global quick-service peers in recent quarters on the back of greater relative visibility into longer-term drivers of the business."

156. Citigroup published a second article on July 18, 2024 titled "Slice to Unit Growth Means Choppy N/T Narrative." The second Citigroup article noted that the Company faces a "tough narrative in the immediate future" and "particularly with questions about the unit growth trajectory, longer-term investors might need more than a 25% pullback/a still mid-20's NTM P/E (on our estimates) to view the pullback as a compelling entry point." Moreover, the second Citigroup article stated that "what feels like a 'surprise' here is likely going to linger in investor sentiment."

As a result of the Company's disclosures, Citigroup lowered its target price for the Company's stock from $530 to $450 and issued a neutral rating for the Domino's.

157. Also on July 18, 2024, Cowen published an article titled "Reduced Int'l Store Growth Outlook Steals the Show." The article noted that "Domino's is temporarily withdrawing guidance for 1,100+ net restaurant openings based on challenges at Domino's Pizza Enterprises (ASX.DMP; not covered), Domino's largest international master franchisee, that are most acute in Japan & France." The article further reported that Cowen was "look[ing] for more clarity on [Domino's] conference call to learn if 1,100+ net restaurant openings can resume by 2027."

158. That same day, Barclays published an article titled "2024 Outlook Tempered on US Comp & Int'l Unit Growth." The article reported that "long-term global unit growth targets will not be achieved in '24 (&'25 at risk) with outsized closures expected by their master franchisee DPE (led by France & Japan). These factors will lead to a reduction in top & therefore bottom line estimates." As such, the article stated that Barclays "struggle[d] with the return to Domino's historical premium valuation relative to our large cap, multi-national, franchised QSR peers," and added "with today's update specific to . . . a shortfall on Int'l unit growth, we believe the valuation gap should narrow further."

159. Also on July 18, 2024, UBS published an article which stated it

expected that the Company's "shares will be under pressure today given . . . Int'l unit growth guidance for '24 is now for net opens to fall 175-275 below the 925+ store target, w/guidance for 1,100+ net stores globally suspended until DPE's open/closure challenges are known." Moreover, the article discussed international store growth and stated that "the suspension of the global target generally wasn't" anticipated and "any add'l insights into considerations for future yrs will be a focus."

160. On this news, Domino's stock price fell $64.23 per share, or 13.6%, from a closing price of $473.27 per share on July 17, 2024 to close at $409.04 per share on July 18, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

161. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $29.2 million to repurchase approximately 65,386 shares of its own common stock at artificially inflated prices from January 2024 through June 2024.

162. According to the Q124 10-Q, between January 1, 2024 and January 28, 2024, the Company repurchased 1,276 shares of its common stock at an average price per share of $412.44 for a total cost to the Company of approximately $526,273.

163. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $4,338 between January 1, 2024 and January 28, 2024.

164. According to the Q124 10-Q, between January 29, 2024 and February 25, 2024, the Company repurchased 1,201 shares of its common stock at an average price per share of $429.31 for a total cost to the Company of approximately $515,601.

165. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $24,344 between January 29, 2024 and February 25, 2024.

166. According to the Q124 10-Q, between February 26, 2024 and March 24, 2024, the Company repurchased 58,936 shares of its common stock at an average price per share of $443.65 for a total cost to the Company of approximately $26.1 million.

167. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $2 million between February 26,

2024 and March 24, 2024.

168. According to the Form 10-Q the Company filed with the SEC on July 18, 2024 (the "Q224 10-Q"), between March 25, 2024 and April 21, 2024, the Company repurchased 1,014 shares of its common stock at an average price per share of $496.25 for a total cost to the Company of approximately $503,198.

169. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $88,431 for repurchases of its own stock between March 25, 2024 and April 21, 2024.

170. According to Q224 10-Q, between April 22, 2024 and May 19, 2024, the Company repurchased 876 shares of its own common stock at an average price per share of $523.37 for a total cost to the Company of approximately $458,472.

171. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $100,153 between April 22, 2024 and May 19, 2024.

172. According to the Q224 10-Q, between May 20, 2024 and June 16, 2024, the Company repurchased 1,229 shares of its own common stock at an average price per share of $522.45 for a total cost to the Company of approximately $642,091.

173. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $139,381 between May 20, 2024 and June 16, 2024.

174. According to the Form 10-Q the Company filed with the SEC on October 10, 2024 (the "Q324 10-Q"), between June 17, 2024 and July 14, 2024, the Company repurchased 854 shares of its common stock at an average price per share of $502.03 for a total cost to the Company of approximately $428,774.

175. As the Company's stock was actually worth only $409.04, the price at which it was trading when markets closed on July 18, 2024, the Company overpaid for repurchases of its own stock by approximately $79,413 between June 17, 2024 and July 14, 2024.

176. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $2.5 million.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

177. Throughout the Relevant Period, the Individual Defendants were aware of the materially false and misleading nature of their statements and those statements disseminated in the name of the Company. The Individual Defendants' knowledge as to the false and misleading statements is evidenced by the accounts of several

confidential witnesses who provided their experiences in the Securities Class Action, the Individual Defendants' own statements during the Relevant Period, and internal company documents.

***Confidential Witnesses***

178. The Confidential Witnesses present in the Securities Class Action detailed the DPE's poor financial condition and shoddy business practices. As CW2 reported, DPE's leasing and accounting team "knew what was going on," namely Samantha Thorburn. CW2 noted that he interacted with Thorburn concerning the leasing of CW2's stores, and that she reported to DPE's former CEO Meij. CW2 added that Thorburn was positioned amongst the inner circle of DPE's senior management.

179. The Individual Defendants repeatedly admitted that they were in continual contact with DPE and thus had up-to-date information concerning DPE's financial status. Further, as evidenced by CW2, the Individual Defendants reasonably had knowledge of DPE's poor financial practices through the awareness of DPE employees of such issues.

180. For instance, during the Q423 Earnings Call, Defendant Reddy stated that "we've been talking to our master franchisees and have good visibility to our expectations there." Likewise, during a Company earnings call held on July 24,

2023, Defendant Reddy discussed the "underlying health" of DPE's markets, as well as "the six-week trend" in DPE's markets. At the September 13, 2023 Piper Sandler Growth Frontiers Conference, Defendant Reddy noted the "underlying health" of DPE's markets, and asserted that the Company was "very confident" in its guidance.

***Internal Documents***

181. [redacted]

182. [redacted]

183. [redacted]

[redacted]

184. [redacted]

[redacted].

185. [redacted]

186. [redacted]

[redacted]

187. [redacted]

[redacted]

188. [redacted]

189. [redacted]

190. [redacted]

[redacted]

191. [redacted]

192. [redacted]

193. [redacted]

194. [redacted]

[redacted] [redacted]

[redacted]

195. [redacted]

196. [redacted]

197. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

198. [redacted]

199. [redacted]

200. [redacted]

[redacted]

[redacted]

201. [redacted]

202. [redacted]

## DAMAGES TO DOMINO'S

203. As a direct and proximate result of the Individual Defendants' conduct, Domino's has lost and will continue to lose and expend many millions of dollars.

204. Such expenditures include, but are not limited to, legal fees, costs, and

any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

205. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

206. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

207. Such losses include the Company's overpayment of approximately $2.5 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

208. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants

who breached their fiduciary duties to the Company.

209. As a direct and proximate result of the Individual Defendants' conduct, Domino's has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

210. Plaintiff brings this action derivatively and for the benefit of Domino's to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Domino's, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

211. Domino's is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

212. Plaintiff is, and has been at all relevant times, a shareholder of Domino's. Plaintiff will adequately and fairly represent the interests of Domino's in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

213. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

214. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Domino's Board consisted of the following nine individuals: Defendants Weiner, Balson, Barry, Brandon, Federico, Goldman, and Lopez (collectively, the "Director-Defendants"), and non-parties Stephen H. Kramer and Diane L. Cafritz (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Director-Defendants that were on the Board at the time this action was filed.

215. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly engage in and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

216. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Domino's to issue materially false and misleading statements. Specifically, the Director-Defendants caused Domino's to issue false and misleading statements which were intended to make Domino's appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

217. Additional reasons that demand on Defendant Weiner is futile follow. Defendant Weiner has served as the CEO of the Company since May 2022 and as a Company director since April 2022. The Company provides Defendant Weiner with his principal occupation, for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer during the Relevant Period, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading

statements alleged herein and personally made many of the false and misleading statements himself, including signing the false and misleading 2023 Form 10-K. Moreover, Defendant Weiner's insider sales made during the Relevant Period, where he netted approximately ***$12.9 million*** in proceeds while the Company's stock price was artificially inflated due to the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. Defendant Weiner is also named as a defendant in the Securities Class Action. For these reasons, too, Defendant Weiner breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218. Additional reasons that demand on Defendant Balson is futile follow. Defendant Balson has served as a Company director since March 1999. He also serves as a member of the Compensation and Human Capital Committee and the Nominating and Corporate Governance Committee. Defendant Balson has received and continues to receive handsome compensation for his role as a director. In addition, he signed the false and misleading 2023 Form 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and

consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Balson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

219. Additional reasons that demand on Defendant Barry is futile follow. Defendant Barry has served as a Company director since July 2018. She also serves as the Chair of the Compensation and Human Capital Committee. Defendant Barry has received and continues to receive handsome compensation for her role as a director. In addition, she signed the false and misleading 2023 Form 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Barry breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

220. Additional reasons that demand on Defendant Brandon is futile follow. Defendant Brandon has served as Chairman of the Board since March 1999 and as Executive Chairman since April 2022. Defendant Brandon has received and

continues to receive handsome compensation for his role as a director. In addition, he signed the false and misleading 2023 Form 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Brandon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

221. Additional reasons that demand on Defendant Federico is futile follow. Defendant Federico has served as a Company director since February 2011. He also serves as the Chair of the Audit Committee. Defendant Federico has received and continues to receive handsome compensation for his role as a director. In addition, he signed the false and misleading 2023 Form 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Federico breached his fiduciary duties, faces a substantial likelihood of liability, is

not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

222. Additional reasons that demand on Defendant Goldman is futile follow. Defendant Goldman has served as a Company director since March 2010. He also serves as a member of the Audit Committee. Defendant Goldman has received and continues to receive handsome compensation for his role as a director. In addition, he signed the false and misleading 2023 Form 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Goldman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

223. Additional reasons that demand on Defendant Lopez is futile follow. Defendant Lopez has served as a Company director since July 2018. She also serves as a member of the Audit Committee and as Chair of the Nominating and Corporate Governance Committee. Defendant Lopez has received and continues to receive handsome compensation for her role as a director. In addition, she signed the false

and misleading 2023 Form 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Lopez breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

224. Additional reasons that demand on the Board is futile follow.

225. [redacted]

[redacted]

226. Defendants Federico (as Chair), Goldman, and Lopez (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them. [redacted]

[redacted]

227. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports,

avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

228. Domino's has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Domino's any part of the damages Domino's suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

229. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

230. The acts complained of herein constitute violations of fiduciary duties owed by Domino's officers and directors, and these acts are incapable of ratification.

231. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Domino's. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Domino's, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

232. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Domino's to sue the Individual Defendants

named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

233. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

234. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235. The Individual Defendants, by virtue of their positions with Domino's and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Domino's and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Domino's to engage in the illegal conduct and practices complained herein.

236. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

237. Plaintiff incorporates by reference and re-alleges each and every

allegation set forth above, as though fully set forth herein.

238. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Domino's. Not only is Domino's now defending claims that is violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Domino's by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase ***65,386*** of its own shares at artificially inflated prices, damaging Domino's.

239. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

240. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or

participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Domino's not misleading.

241. The Individual Defendants as top executives and directors acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

242. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

243. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

## THIRD CLAIM
## Against the Individual Defendants for Breach of Fiduciary Duties

244. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245. Each Individual Defendant owed to the Company the duty to exercise

candor, good faith, and loyalty in the management and administration of Domino's business and affairs.

246. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

247. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Domino's.

248. In breach of their fiduciary duties owed to Domino's, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (i) DPE was experiencing significant challenges with respect to both new store openings and closures of existing stores; (ii) as a result, the Company was unlikely to meet its long-term guidance announced in the 2023 Investor Day presentation for global annual net store growth; and (iii) the Company's business and/or financial prospects were overstated. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

249. In further breach of their fiduciary duties, the Individual Defendants

failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

250. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

251. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $15.2 million.

252. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Domino's securities.

253. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Domino's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

254. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

255. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Domino's has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

256. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants for Unjust Enrichment**

257. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

258. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Domino's.

259. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Domino's that was tied to the performance or artificially inflated valuation of Domino's, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

260. Plaintiff, as a shareholder and a representative of Domino's, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their

wrongful conduct and breach of their fiduciary and contractual duties.

261. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

262. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

263. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Domino's, for which they are legally responsible.

264. As a direct and proximate result of the Individual Defendants' abuse of control, Domino's has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

265. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

266. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets

and business of Domino's in a manner consistent with the operations of a publicly held corporation.

268. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Domino's has sustained and will continue to sustain significant damages.

269. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

270. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

**SEVENTH CLAIM**

**Against the Individual Defendants for Waste of Corporate Assets**

271. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

272. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

273. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

274. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have

caused Domino's to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

275. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

276. Plaintiff, on behalf of Domino's, has no adequate remedy at law.

## EIGTH CLAIM
## Against Defendants Weiner, Reddy, Jordan, and D'Elia for Contribution Under Sections 10(b) and 21D of the Exchange Act

277. Plaintiff incorporates by reference and realleges each and every allegation set forth in above, as though fully set forth herein.

278. Domino's and Defendants Weiner, Reddy, Jordan, and D'Elia are named as defendants in the Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Weiner's, Reddy's, Jordan's, and D'Elia's willful and/or reckless violations of their obligations as officers, directors, and/or former officers Domino's.

279. Defendants Weiner, Reddy, Jordan, and D'Elia because of their positions of control and authority as officers, directors, and/or former officers of Domino's, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Domino's, including the wrongful acts complained of herein and in the Securities Class Action.

280. Accordingly, Defendants Weiner, Reddy, Jordan, and D'Elia are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

281. As such, Domino's is entitled to receive all appropriate contribution or indemnification from Defendants Weiner, Reddy, Jordan, and D'Elia.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Domino's, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Domino's;

(c) Determining and awarding to Domino's the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Domino's and the Individual Defendants to take all necessary actions to reform and improve Domino's corporate governance and internal procedures to comply with applicable laws and to protect Domino's and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of Domino's to nominate at least five candidates for election to the Board;
3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Domino's restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: February 12, 2026

Respectfully submitted,

By: */s/ Timothy Brown*_ ___________

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

## VERIFICATION

I, Michael Walker, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of January, 2026

Michael Walker

Michael Walker